May it please the Court. Sean Hart, Hart Law Office. We're here today in an appeal of Brown v. King County. I've been watching the advance sheets. And with regard to the standard for 1983, and I noticed about six months after the briefs were submitted that the Second Circuit has adopted a standard for 1983, which I believe this Court should adopt. At the district court level, the district court applied the standard of 42 U.S.C. 2000e2 to 1983. And this is the wrong standard because under the clear statutory language of 2000e2, it requires disparate impact. And 1983 does not require disparate impact. Now, the cases aren't real clear on exactly what's required for 1983. Mrs. Brown argued in her pleadings that it requires any intentional act. And the district court found that she was required to prove disparate impact. And, see, part of the appeal isn't just an appeal of an erroneous view of the law under Rule 60. But in discovery, King County actually withheld the documents that would prove any kind of disparate impact. So there are actually two bases for the Court reviewing the improper application of 2000e2 to 1983. Also, another very big issue in this case, there were several causes of action. Under the third cause of action, which was brought under Washington law, it was a wrongful discharge cause of action. And the Washington State Supreme Court has clearly said that there is a wrongful discharge cause of action for violations of public policy when a pregnant woman is discharged. In fact, the two cases I cite, in one, the Supreme Court specifically states, we recognize this cause of action. And then approximately a year later, the Supreme Court again said, we recognize this cause of action. And at the district court level, the district court declined to recognize that cause of action. And when State law is applied in Federal court where a district court has supplemental jurisdiction, they're required to apply the law of the highest State court. And so there is absolutely no doubt that Washington State recognizes this cause of action. Another issue in this case is the issue of spoliation. And one thing that might help the Court would be a brief review of the facts of the case. What happened here was Mrs. Brown was hired as a court reporter, and she was working full-time. And she worked for more than six months. And she was working full-time hours, and she got pregnant. And the ‑‑ she told her ‑‑ she told the third-in-command in the judicial administration, Steve Crozier, that she was pregnant. And Crozier told the second-in-command, Claudia Olney, she's pregnant. And Claudia Olney asked, how much transcript does she have? And Olney said, she's got approximately 8,000 pages. And Mrs. Brown was not in violation of any rule with regard to transcripts. How long does it take to transcribe 8,000 pages, roughly? Like how many days' work is that, roughly? It would be ‑‑ well, Your Honor, it all depends if a court reporter focused. You know, a court reporter, I ‑‑ I'm just trying to assess how much of a backlog that is. It sounds pretty substantial. Well, Your Honor, that ‑‑ That's the average court reporter leave I have outstanding. Well, King County refused to provide that information, Your Honor. I specifically asked that. You don't have any sense of how many pages your client transcribes a day when she's working? My ‑‑ to answer Your Honor's question, one of the cases that she was transcribing was 5,000 pages. So that means if a court reporter has two cases, they can get orders that would put them, that would give them, you know, 10,000 pages. Two murder trials equals 10,000 pages. You're still not answering my question. Your Honor, I would ‑‑ How many pages can she transcribe a day, so how long is she behind? And there's a point at which the longer it's delayed from the transcription, you know, to the transcription after the event, maybe it makes it harder for them. I don't know. I've never been a court reporter. But certainly it becomes a backlog at some point. Well, Your Honor, there's a difference between backlog and overdue. What happens is ‑‑ I'm not saying it's overdue. I'm asking how long would it take to do it. You're just saying you have no idea. Not off the top of my head, no, sir. Okay, well, that's fine. The record doesn't tell us. Mrs. Brown felt that she could meet the due date on the ordered transcript. And, in fact, she was being extra careful because she contacted the Court of Appeals and said, I would just like a little extra time just in case that I get additional orders. And so she was not ‑‑ she wasn't overdue. You know, the process, as Your Honor is well aware, when you appeal, you're given a date by which you're expected to have the transcript and so you can do your briefs. And if it's ‑‑ if the court reporter can deliver it on time, I mean, there's no adverse effect on any party. So ‑‑ Right, except if you have a backlog and you need to be working full time to get case number one transcript to the appellate court on time. Yes. And at the same time you're in the courtroom during the day taking down other cases. You know, at some point it's just not practical. Well, Your Honor, King County has no standard whatsoever for backlog and they specifically made one for Mrs. Brown. And in the record they admit they had never made it before. They made it for her after she told them she was pregnant. Claudia Olney, as soon as Steve Proger said she's pregnant, Claudia Olney said, oh, how much transfer backlog does she have? And then it came back 8,000 pages and ‑‑ Do you know, I mean, since you brought this case, do you have anything in the record on what the average backlog is of the full time court reporters in that court? I don't have any personal knowledge. Also, that's in fact why I submitted the interrogatory to King County and King County ignored that interrogatory. They refused to answer. Did you ‑‑ And I did a motion to compel, Your Honor. Did you notice depositions of court reporters? No. Did you understand what their backlog was? No, Your Honor. We were limited, I believe, to ten depositions. And as the case developed, King County kept bringing in other management personnel saying, this person made this decision, this person made this decision. And so very quickly we were up to our ten. All right. Thank you. So with regard to ‑‑ with regard to the facts, so after she informed them she was pregnant and after Claudia Olney made a standard specifically for Mrs. Brown, then Claudia Olney came to Mrs. Brown and said, you've got 8,000 pages, I've just made a standard for the first time for you. Did she use those words? No, Your Honor. She said ‑‑ she ‑‑ Steve Crozier, she told Steve Crozier she is not allowed to work until she has less than 2,000 pages. And that's in the request for admission. And also in the request for admission is their admission that they had never made a standard before and they made it just for her after she told them she was pregnant. So they made a standard just for her and then Claudia Olney told Steve Crozier, tell her she is out of here until she has less than 2,000 pages. And so she was terminated at that point. And then another full‑time position came open and so she had previously spoken with the hiring committee and the hiring committee chairman for the Seattle courthouse said, you are the most qualified, you're going to be the next one hired. And at that point Townsend Sr. went to the chairman of the hiring committee and asked, are you going to hire my son? And the chairman said, no, he's not qualified, and if he did, it would be nepotism. And that's in the deposition of Townsend Sr. So then what happened is they transferred the job application process down to a satellite courthouse, the Kent Regional Justice Center. And once they got down there, they withheld the job application, which has the standard on it, from the hiring committee. And so the hiring committee had no idea what this standard was. And when I deposed the member of the hiring committee that supposedly made the decision, she says, when I asked her, how did you evaluate the candidates? She said, there is no standard. And I showed her the application, which says you have to be a college graduate or a graduate from a certified court reporter school. And in this case, the record clearly shows that Townsend Jr. flunked out of both. And he was hired anyway after Olney interviewed him. Now, Olney is which level? The second in command. Well, just incidentally, one of those three critical e-mails has Olney saying that, in her opinion, a reporter can turn out 200 pages a day in transcripts. So at that point, they were assuming it would take Lisa two months to complete her pending transcripts. That's what it looks like, Your Honor. Once again, there's, you know, if a court reporter works 18 hours a day, I believe their 200-page thing would be if they were assuming that she worked eight hours and then worked on the transcript for four hours and then visited with the family and got sleep. Eighteen hours a day is kind of tough. That sounds like a lawyer's or a judge's job. Yes, Your Honor. Yes, Your Honor. Or a law clerk. I've had Mrs. Brown work on a few. Is that in the record the pace at which a person has to work or that the 200 pages a day contemplates that a person be working full-time doing this in addition to working full-time and can still produce 200? Your Honor, there's no standard anywhere. And it's the same. There's nothing in the record about how long she'd have to work to do this job, is there? That is, to do the 8,000 pages. That's correct, Your Honor. Well, now, your guess that about 18 hours is from where? I didn't bring up the 18 hours, but if even their ---- The proposition that she could do 200 pages a day and still do a full day's reporting is ---- Oh, yes, Your Honor. That's very doable because you've got to remember that these court reporters say ---- Is that in the record? Is that in the record? It's their admission in the e-mail. Okay. She could do 200 pages a day while still reporting full-time? That's not what it says. I believe that's what the ---- they said they can do 200 pages. Also, Your Honor, remember the big point, big picture here. If it's not past the due date, if it's not past the due date, it's not due. See, that's one thing that Claudia only ---- Yes, it is. It's due before the due date or on the due date. Now, I suggest that you focus on the issues that are in front of us. Some of us have had experience with court reporters, and some of it good, some of it bad. And let me ask you, which of the nine claims do you say are before the Court? Claim 9, right? Yes, Your Honor. What about Claim 1 through 8? Claim 1 through 4 are before the Court, Your Honor. Claim 1 through 4 are before the Court on this appeal? Yes, Your Honor. And what about 5, 6, 7, 8? No, Your Honor. 5, 6, 7, and 8 are not. And the reason ---- How does 1, 2, 3, and 4 get before us? What notice of appeal carries our jurisdiction on 1, 2, 3, and 4? Under Rule 60, Mrs. Brown made a motion to Rule 60 under B. So it's through 60B that we have jurisdiction to review what happened in 1, 2, 3, and 4? Yes, Your Honor. Now, what is there to review under 60B that could not be reviewed on a direct appeal of 1, 2, 3, and 4? You understand, the judgments were entered against you on 1, 2, 3, and 4. I take it your notice of appeal as to the judgment does not hit 1, 2, 3, and 4. 1, 2, and 3, and 4 are before us only because you appealed the denial of Rule 60. Am I right? Yes, Your Honor. And you think an appeal of a denial of Rule 60 somehow refers to 1, 2, 3, and ---- claims 1, 2, 3, and 4? Oh, yes, Your Honor. In my motion, that's what I refer to. And I refer to it because ---- Well, you referred to two orders on discovery. Am I right? I ---- Under 60B? Yes, I did that, too, Your Honor. Yes. Because the cause of action, you know, I included the cause of action and the ---- So the 60B was the motion to set aside the judgments on 1, 2, 3, and 4? Yes, Your Honor. That's correct. The interim rulings on the discovery. Yes, that's correct, Your Honor. And the reason is where I started, where the erroneous view of the law, because the trial court applied ---- Now, back to 60B. The standard of review for us is an abuse of discretion. Yes, Your Honor. So we do not look at the legality of or review anything de novo. Yes, I understand that. Under the 60B for 1, 2, 3, and 4, I understand that. And I've cited two Supreme Court cases and several cases stating that under Rule 60B, it's an abuse of discretion if the trial court applies an erroneous view of the law. Well, yes, but that's if it applies an erroneous view of the law and it's citing the 60B motion, but not if it ---- the 60B motion is designed to attack some underlying ruling that was erroneous made six months earlier. Yes, Your Honor. But if the motion tells the judge, Judge, you apply 2000e2 to 1983, and the judge says, yes, I did, and I'd do it again, you know, that's reviewable under 60B. You think it is. Yes, Your Honor. And I cited, I believe it's two Supreme Court cases and I believe three Ninth Circuit cases to that effect. And the step is Rule 60B, abuse of discretion, and there's an abuse of discretion where there's an erroneous view of the law. So it's your view that 60B will pick up any and preserve any erroneous ruling that the Court made as a matter of interim rulings headed toward the entry of judgment? Yes, Your Honor. I do. Wouldn't that extend the time to appeal to the ends of time? No, Your Honor, because 60B, you can only bring it one year from the date. But it would let you have a year to raise any appellate issue instead of the normal time to file a notice of appeal? Hypothetically, it could, Your Honor. I don't think that's a traditional view of Rule 60B. Does Wright and Miller, which is one of the leading treatises, do they comment on this issue? I believe that's where I got my first citations. Well, you know, it's an abuse of discretion to make an error of law about the standards under Rule 60B, but that's not saying that it's an abuse of discretion. It doesn't follow to say from that that it's an abuse of discretion to deny 60B relief any time there's an error of law in the underlying trial, at least I see it. Well, Your Honor, the cases say that when there's an erroneous view of the law, that is an abuse of discretion, and when the court doesn't correct it, it preserves it for appeal. When they say erroneous view of the law, the cases you're citing, are they talking about an erroneous view of the law in the initial rulings made that led to judgment? The purpose is that you What they say, Your Honor, is that when a party discovers that a judge in an order has adopted an erroneous view of the law, it actually gives the judge an opportunity to correct what the previous ruling. And if the judge doesn't, if he says, I'm adopting it for a second time, 2000, 42 U.S.C. 2000e2, disparate impact is the rule for 1983. That's what he said, and it's incorrect. Disparate impact is not the rule for 1983. You notice that the Court, in denying your 60B motion, cited to a Seventh Circuit court case that said that for the proposition that, however, legal error is not a proper basis for relief under Rule 59 or 60. Yes, Your Honor. That was kind of an unusual case. It doesn't apply here. The facts aren't even close. What happened there was, I believe it was even a It may have been a prisoner, but it was a case, a prisoner case, but it was a case where a person filed a second complaint and then on appeal said, oh, that second complaint is a Rule 60 motion. And the Seventh Circuit said, that's not a Rule 60 motion. That's a second complaint. So it has nothing to do with the fact pattern that we have here. And that proposition of law is not announced in that case? That the judge, that the trial court cited it for? The legal error is not a proper basis for relief under Rule 69 or 60? Your Honor, in that case, see, in that case, the facts were so intertwined with the, that I would I believe that the facts of the case, in the case, since it was a second complaint styled on appeal as a Rule 60, that they said that the rule did not apply there. And I cited in the brief the Supreme Court cases and the cases from this circuit where it says that it's an abuse of discretion to file a second complaint to adopt an erroneous view of the law. And I think the district court should have the opportunity to correct when there is an erroneous view of the law, because it can prevent a custody appeal. So this Court should uphold the Rule 60 rule and give the district courts an opportunity to correct themselves so you don't have to appeal. Also, I might mention that you've gone well over your time. You haven't, you don't waive any of your arguments by not raising them at this point. So thank you very much. Okay. Thank you. Thank you. Good morning. May it please the Court. My name is Stephen Tepley. I'm the Senior Deputy Prosecuting Attorney with King County, and I represent Superior Court in this matter. If I may, I would like to address the issue of standard of review. The Court is correct that we are here on review of a Rule 60b motion. Mr. Hart, on behalf of his client, did not preserve the actual underlying merits of the summary judgment arguments in that he did not directly appeal them. Therefore, this Court is to decide whether or not Judge Kunauer abused his discretion when he denied Ms. Brown's 60b motion. A Ninth Circuit case, which I cited in my brief, Floyd v. Laws at 929 F. 2nd, 1390, holds that an appeal from a denial of a 60b motion does not preserve the merits of the underlying judgment for purposes of appeal. The Seventh Circuit case, which Judge Kunauer relied on, also holds that an error of law cannot be a basis for granting relief under 60b, and for good reason. Essentially, as Your Honor indicated, that would make the deadline for filing a motion of appeal moot. Mr. Tepley, I'll perhaps simplify your argument a little bit here. I don't really need to hear from Appelli further on this, so you can direct your arguments to the other members of the panel as far as I'm concerned. Very well. I can also address the panel's issues or questions regarding the production of transcript. That issue was briefed in Defendant's initial wrote motion. It's clear from, if you just read the end of the sentence, that counsel argues is an omission on behalf of the Court. They say it says, doing nothing else. So I don't think we need to hear about that. And I really have no questions either. I just have except one. Yes, Your Honor. Which is, why wasn't the request, the discovery request that asked for any other files or documents regarding Lisa Brown that are maintained, why wasn't that specific enough to get to e-mails? I'm just wondering, were the e-mails not searched? Were they not kept? Was the hard drive not looked at? I mean, what was that all about? Your Honor, the Court's characterization of the request is incorrect. Okay. What Ms. Brown asked for was not all other documents related to Lisa Brown. The courts or? Your Honor, what Your Honor just recited to me regarding the, I'm assuming that the Court is referring to the public disclosure request? Right. Yeah. If I may, Your Honor. And the ruling that your failure to produce the three e-mails, which specifically reference Lisa Brown, was not due to bad faith. Yes, Your Honor. Okay. And I will address both those questions. You don't need to do it at length. I just want to know, why was her request not specific enough to get the e-mails? Because she didn't ask for the e-mails. She asked for information about the e-mails. She asked, and it's critical, I think, that the Court look at the actual language used in the request, because that was the language that my clients looked at in determining whether or not they needed to respond. I will remind the Court that the Public Disclosure Act in the State of Washington does not require Washington to provide information about records. Rather, it requires them to provide records themselves. And where a requester asks for information about records, we have no obligation whatsoever to respond. And the actual request is, I'll read it verbatim, a complete copy of the personnel file of Lisa Brown held by King County Superior Court, period. If any other files or documents regarding Lisa Brown are maintained, indicate the existence of these documents, the locations of the documents, and the custodian of the documents in your response. Clearly, Your Honor, the question didn't ask for the documents. It asked for us to indicate whether they existed, where they were maintained, and who the custodian of the documents were.  Well, why wouldn't you list the e-mails then, or did you? We're not required to. You're not required to give lists. You're just required to produce documents. Right. If we have the documents and they ask for the documents, we're required to give them. If we have the documents and they ask for information about the documents, we're not required to respond. The law doesn't even require us to ask for clarification. They have to make a clear request for identifiable public records. Alternatively, could this have been requested just as through regular discovery? Yes. Yes, it could have been. And it was provided. As the record indicates, the fact that the documents existed had to do with Stephen Crozier. In anticipation of his deposition testimony, he reviewed those documents, and that was the first time that we at King County became aware of their existence. After that, we provided them. So the documents were provided, but they were not provided as part of the public disclosure request. They were provided later as part of discovery. All right. Well, I don't have any further questions. No? Nothing further from the Court. I'll conclude. We've observed your arguments. We've read the lengthy briefs. Thank you very much. Thank you very much, counsel. And the case of Brown v. King County will be submitted. Go ahead. Would you like me to take a break? The Court will be in a brief about recess. All rise. The Court is back in recess.  Thank you. Thank you.
judges: Leavy, Wardlaw, Gould